UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA         :

              -v.-               :
                                     07 Cr. 1015 (LAK)
MICHAEL DEDE,                    :
        a/k/a "Bart,"
        a/k/a "Sunshine,"       :

              Defendant.         :

------------------------------x

**GOVERNMENT'S SENTENCING MEMORANDUM**

                                   MICHAEL J. GARCIA
                                   United States Attorney for the
                                   Southern District of New York

TODD BLANCHE
Assistant United States Attorney

        - *Of Counsel* -

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 19, 2008

**BY HAND**

The Honorable Lewis A. Kaplan
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York  10007

> Re:  <u>United States v. Michael Dede, a/k/a "Bart," a/k/a
> "Sunshine"</u>, 07 Cr. 1015 (LAK)

Dear Judge Kaplan:

The Government respectfully submits this letter in
advance of the defendant's sentencing scheduled for May 23, 2008,
at 11:00 a.m., and in response to the defendant's May 12, 2008
letter ("Def. Ltr."). For the reasons that follow, the
Government agrees with the Probation Office that a sentence
within the applicable Guidelines range of 235 to 293 months'
imprisonment is appropriate and reasonable in this case.

### Procedural History

Indictment 07 Cr. 1015 (LAK) charged the defendant
Michael Dede, a/k/a "Bart," a/k/a "Sunshine," in one count,
namely, that, from at least in or about 2004, up through and
including August 2006, the defendant unlawfully, intentionally,
and knowingly conspired to possess with intent to distribute, and
did distribute, more than one kilogram of heroin, in violation of
Title 21, United States Code, Sections 812, 841(a)(1),
841(b)(1)(A), and 846. (PSR ¶¶ 1, 2).[1] On February 21, 2008,
following a jury trial, the defendant was convicted of Count One
of the Indictment. (PSR ¶ 3).

_____

[1] References to "PSR" are to the pre-sentence investigation
report, dated May 16, 2008.

Hon. Lewis A. Kaplan
May 19, 2008
Page 3

## Evidence at Trial

The evidence at trial established beyond a reasonable
doubt that the defendant, along with several other individuals,
including Jose Cruz and Lester Farrell, was part of a heroin
organization located in the Bronx that distributed and sold
dozens of kilograms of heroin over a 7 year period to various
drug spots located throughout the Bronx.  (Tr. 86, 87, 113 -
130).[2]  One of the defendant's co-conspirators, Jose Cruz,
testified at the trial pursuant to a cooperation agreement.  (Tr.
91 - 94).  Cruz testified that between 1999 and 2004, the
defendant supplied their organization with between 20 and 30
kilograms of heroin:

> Q.    Talking now about the 1999 to 2004 time
>       frame, approximately how much heroin did
>       the defendant supply you with during
>       that time?
>
> A.    About 20, 30 kilograms.  Kilos.
>
> Q.    How were you getting that?  How are you
>       doing the math on that?
>
> A.    About 400 grams a month, 400 to 600
>       grams a month by the year.  150 grams a
>       week to 200 grams a week.  So sometimes
>       300 to about 600 grams a month.
>
> Q.    How much heroin would that be
>       approximately over the course of a year?
>
> A.    Around 7 kilograms.
>
> Q.    By the way could it be a little more?
>
> A.    Yes, it can.
>
> Q.    Could it be a little less?
>
> A.    [I] doubt it.

---

[2] References to "Tr." are to the transcript from the trial,
dated February 13, 14, 19, 20, and 21, 2008.

Hon. Lewis A. Kaplan
May 19, 2008
Page 4

(Tr. 86).  Between 2004 and August 2006, Cruz testified that the
defendant supplied him with another 20 kilograms of heroin:

> Q.    Going from the 2004 time frame until the
>        time you were arrested, which you said
>        was in August of 2006, how much heroin
>        was the defendant supplying you with
>        during that time?
>
> A.    Another 20 kilograms.

(Tr. 86).  During the time-frame charged in the Indictment, the
defendant supplied more heroin to Cruz then he had previously.

        Cruz testified about where the defendant supplied the
heroin to him.  Cruz testified that he would pick up heroin from
the defendant "at 198th Street and Morris, sometimes Bronxdale,
sometimes Pelham Parkway, sometimes at [the defendant's] house,
sometimes at [the defendant's] job." (Tr. 87).  In addition to
supplying Cruz with multiple kilograms of heroin, the defendant
also assisted Cruz in packaging the heroin into bundles to
prepare it to be sold on the streets.  (Tr. 89).  The defendant
was well-paid for his efforts, both for supplying Cruz with
heroin, and for assisting Cruz in bagging the heroin for sale on
the streets:

> Q.    What would the defendant do?
>
> A.    Then he would tape the bags also and
>        wrap them up in rubber bands for us.
>
> Q.    Why would he tape up the bags?
>
> A.    Because he was good at it and fast,
>        because he had done it in the past.
>
> Q.    What do you mean by that?
>
> A.    He used to package up heroin for people,
>        so he already knew how to do it.  He was
>        more experienced and everything, so I
>        would pay him to help me at times.
>
> Q.    Would you pay him for this?
>
> A.    Yes, I would.
>
> Q.    How much would you pay him?

Hon. Lewis A. Kaplan
May 19, 2008
Page 5

> A.    $2 off every gram.  Meaning if he
>        packaged up a hundred grams, he would
>        make $200.
>
> . . . .
>
> Q.    Tell me about a typical deal with the
>        defendant.  How would it get set up and
>        how would it happen?
>
> A.    I met up with him, asked him if I would
>        get this X amount  of heroin.  He would
>        tell me the price and tell me I wanted
>        that amount, I had to give a certain
>        amount of money. Suppose I asked for $30
>        worth of heroin.  Sometimes I would give
>        -- if I asked for $30,000 worth of
>        heroin, I would give him 10,000 or
>        15,000 up front, and then pay the rest
>        as I distributed the heroin.
>
> Q.    How long would it typically take you to
>        pay the rest?
>
> A.    Sometimes three days, sometimes four
>        days, sometimes a week.

(Tr. 121-123).

        Cruz also testified extensively about his own criminal
conduct and other co-conspirators who worked with him in the drug
business.  (Tr. 110 - 130).  Another one of the defendant's co-
conspirators was Lester Farrell.  Farrell also testified at trial
pursuant to a cooperation agreement.  (Tr. 260 - 261).  Farrell,
like Cruz, testified about the defendant's extensive involvement
in distributing heroin over the course of several years.  (Tr.
255 - 259).  Farrell testified about delivering thousands of
dollars to the defendant in August 2006.  (Tr. 268 - 270).  He
also testified about going to the defendant's house to pick up
heroin.  (Tr. 257 - 259).

        Finally, the Government introduced physical evidence,
including heroin sold by the defendant to Jose Cruz, and drug
paraphernalia that was recovered from Cruz's stash house after
Cruz and Farrell's arrest.

Hon. Lewis A. Kaplan
May 19, 2008
Page 6

       This evidence, combined with two law enforcement
witnesses who testified about seeing the defendant with Jose
Cruz, telephone records that linked the defendant to Cruz and
Farrell, and the defendant's post-arrest statement, established
beyond a reasonable doubt that the defendant was a member of a
multi-kilogram heroin organization between 1999 and 2006.

       The defendant presented a defense case.  Cynthia Diaz,
the defendant's wife, testified about the defendant's background,
their relationship, and their financial situation.  Ms. Diaz also
testified that the defendant was not a drug dealer, and she
denied ever being present when the defendant was collecting money
or delivering heroin.  (Tr. 348 - 366).

       The jury convicted the defendant.  (Tr. 516).

### The Pre-Sentence Report

       The pre-sentence investigation report (the "PSR"),
dated May 16, 2008, correctly finds that the base offense level
is 38, and that the defendant is in Criminal History Category I.
(PSR ¶¶ 26, 64).  According to the PSR, the defendant has several
prior arrests, and three prior convictions, the most recent being
in 1993.  (PSR ¶¶ 28 - 37).  Because of the nature and age of the
defendant's prior convictions, the defendant only has one
criminal history point, placing him in Criminal History Category
I.  The sentencing guidelines range is 235 - 293 months'
imprisonment.  (PSR ¶ 64).  Probation recommends a bottom of the
Guidelines sentence of 235 months' imprisonment.  In recommending
a sentence of 235 months, probation explains:

              We are deeply disturbed by the ironic nature
              of Mr. Dede's life.  Here you have . . . a
              warm, loving, pro-social, honest working and
              charismatic individual who has had a positive
              impact on many, many people's lives in his
              community – while at the same time, behind
              the scene, you have a serious drug dealer who
              was irreparably poisoning the very same
              community that he professed to love and which
              loved him.

(PSR p. 21).

### Discussion

       The Government respectfully recommends that a
Guidelines sentence (within the 235 - 293 months' range) is

Hon. Lewis A. Kaplan
May 19, 2008
Page 7

appropriate and reasonable in this case. The defendant has
failed to accept *any* responsibility for his actions, nor has he
demonstrated circumstances that uniquely distinguish him from a
typical defendant convicted of distributing between 40 and 50
kilograms of heroin over a 7 year period that would justify
leniency from the Court in the form of a below-Guidelines
sentence.

## A.    The Guidelines Provide A Benchmark In Determining The Appropriate Sentence

The Guidelines still provide strong guidance to the
Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005)
and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).
Although *Booker* held that the Guidelines are no longer mandatory,
it held also that the Guidelines remain in place and that
district courts must "consult" the Guidelines and "take them into
account" when sentencing. 543 U.S. at 264. As the Supreme Court
recently stated, "a district court should begin all sentencing
proceedings by correctly calculating the applicable Guidelines
range" — that "should be the starting point and the initial
benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge
must consider seven factors outlined in Title 18, United States
Code, Section 3553(a): "the nature and circumstances of the
offense and the history and characteristics of the defendant" (§
3553(a)(1)); the four legitimate purposes of sentencing (§
3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3));
the Guidelines range itself (§ 3553(a)(4)); any relevant policy
statement by the Sentencing Commission (§ 3553(a)(5)); "the need
to avoid unwarranted sentence disparities among defendants"
(§ 3553(a)(6)); and "the need to provide restitution to any
victims" (§ 3553(a)(7)). *Gall* v. *United States*, 128 S. Ct. at
596-97.

In determining the appropriate sentence, the statute
directs judges to "impose a sentence sufficient, but not greater
than necessary, to comply with the purposes" of sentencing, which
are:

> (A)  to reflect the seriousness of the offense, to
> promote respect for the law, and to provide just
> punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;

Hon. Lewis A. Kaplan
May 19, 2008
Page 8

> (C)  to protect the public from further crimes of the
>       defendant; and
>
> (D)  to provide the defendant with needed educational
>       or vocational training, medical care, or other
>       correctional treatment in the most effective
>       manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence
necessarily lies within the Guidelines range, but "the fact that
§ 3553(a) explicitly directs sentencing courts to consider the
Guidelines supports the premise that district courts must begin
their analysis with the Guidelines and remain cognizant of them
throughout the sentencing process." *Gall*, 128 S. Ct. at 596-97 &
n.6  Their relevance throughout the sentencing process stems in
part from the fact that, while the Guidelines are advisory, "the
sentencing statutes envision both the sentencing judge and the
Commission as carrying out the same basic § 3553(a) objectives,"
*Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the
Guidelines are "the product of careful study based on extensive
empirical evidence derived from the review of thousands of
individual sentencing decisions," *Gall*, 2007 WL 4292116, at *6;
*see also Rita* v. *United States*, 127 S. Ct. at 2464.  To the
extent a sentencing court varies from the Guidelines sentence,
"[it] must consider the extent of the deviation and ensure that
the justification is sufficiently compelling to support the
degree of the variance." *Gall*, 128 S. Ct. at 597.

One of the important reasons why the Guidelines should
be given substantial weight is that they represent the reasoned
judgment of the United States Sentencing Commission. *See United
States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006).  The
Sentencing Commission is a body of experts whose statutory
mission is to apply "research, experience, and analysis" to
promulgate guidelines that will "further the basic purposes of
criminal punishment: deterrence, incapacitation, just punishment,
and rehabilitation." U.S.S.G. Ch. 1, Pt. A, § 2.  Because these
basic purposes of criminal punishment — which essentially mirror
the purposes that this Court must consider pursuant to Section
3553(a)(2) — are inherently abstract, it is difficult to
overstate the value of the perspective of a national commission
whose charter is to collect and analyze data on sentences imposed
throughout the nation.  Absent the national perspective they
provide, it is hard to imagine how the sentencing factor
identified in Section 3553(a)(6) — namely, "the need to avoid

Hon. Lewis A. Kaplan
May 19, 2008
Page 9

unwarranted disparities among defendants with similar records who
have been found guilty of similar conduct" — could be
meaningfully considered at all.

**B.    The Court Should Strongly Consider a Guidelines Sentence in
This Case**

Here, the Probation Department has recommended a
specific sentence of 235 months' imprisonment.  The defendant
argues for a sentence of 120 months' imprisonment, a sentence
that is 115 months below the Guidelines Range.  (Def. Ltr. at 1).
The Court should impose a Guidelines sentence.

The defendant identifies several factors that he
contends counsels for a non-guidelines sentence of 120 months'
imprisonment.  In particular, the defendant argues that (1) his
adult life has been marked by service to others, (2) he has
worked hard during his life, and (3) a non-Guidelines sentence
will allow him to more quickly resume his job and rejoin his
family.  (Def. Ltr. at 1 - 2).  The defendant's submission also
attaches many letters from friends and family that speak to the
defendant's dedication to family, friends, and his community.
The Government submits, however, that none of these factors
warrant a non-guidelines sentence.

Noticeably absent from the defendant's lengthy
submission is any explanation for the double life the defendant
was leading from at least 1999 through at least August 2006.  The
defendant was distributing approximately 7 kilograms of heroin a
year, year after year, from 1999 through 2004.  Thereafter, he
increased the amount of heroin he was distributing to
approximately 10 kilograms a year.  The defendant was a key
member of a large heroin organization, serving as the
organization's main supplier, in addition to assisting in
converting the heroin from a hard, rock-like substance into small
bundles, to be re-sold on the streets to addicts for $5, $10, or
$20.  This unmistakable and undeniable fact stands in stark
contrast to the defendant's submission and attached exhibits,
which speak to a typical life of hard work, surrounded by family
and friends.

It appears from the PSR and the defendant's submission
that the defendant is surrounded by law-abiding family and
friends who are successful, and who mistakenly believed that the
defendant shared their values.  Sadly, it appears that, in
addition to evading and hiding his crimes from law enforcement
for over seven years, the defendant also managed to hide his drug

Hon. Lewis A. Kaplan
May 19, 2008
Page 10

dealing from his family and friends.  This is not surprising.  As
the evidence at trial showed, the defendant had a unique role in
the conspiracy.  The defendant was not on the streets making
hand-to-hand deals, nor was he riding around, like Jose Cruz, in
an expensive car to various drug spots distributing bundles of
heroin.  Rather, the defendant was able to work behind the
scenes, meeting Jose Cruz and Lester Farrell in his apartment, at
his job, and at locations where he was protected from the
watchful eye of law enforcement.  To be sure, his role in the
conspiracy was different than Jose Cruz and Lester Farrell.
However, it was just as significant, or even more so, considering
he served as the main heroin supplier for the organization.  In
addition, the evidence at trial established that the defendant
did not keep his family and job completely separate from his drug
dealing.  Indeed, Cruz and Farrell testified that they would go
to the defendant's house to pick up the heroin, and Cruz
testified about meeting the defendant while he was working to
pick up heroin.  Thus, the defendant's submission and attached
exhibits only tell part of the story.  Left out of the picture is
the fact that even though the defendant had a loving wife, loving
children that he supported, and friends, he still chose to deal
in poison.

        Moreover, the defendant's conduct does not reflect an
aberration of an otherwise lawful life.  According to the PSR,
the defendant was on probation until May 1997, for a youthful
offender conviction for larceny when he was caught stripping a
stolen automobile.  Less than two years after his probation
ended, he started dealing heroin with Jose Cruz.  He continued to
deal heroin, week after week, month after month, year after year,
until Jose Cruz got arrested.  The defendant did not have a
change of heart.  The defendant did not choose to stop dealing
heroin.  Rather, he stopped dealing heroin when his co-
conspirators got arrested.  A background such as this does not
counsel for any deviation from the Guidelines Range, much less
the significant deviation he requests.

        Further, as the PSR notes, a sentence of 120 months'
imprisonment, as the defendant requests, would reflect an offense
involving between 700 grams and 1 kilogram of heroin.  As the
evidence at trial showed, however, the defendant was often
supplying his co-conspirators with 700 - 1000 grams of heroin on
a weekly basis during the course of the conspiracy.  (Tr. 86 - 87
(Cruz: "Sometimes [Dede] would give me 1000 grams a week,
sometimes he would give me 700 grams a week, sometimes he would
give me 800 grams a week.")).  Such a significant deviation from
the Guidelines is not warranted, notwithstanding the family and

Hon. Lewis A. Kaplan
May 19, 2008
Page 11

friends that surround the defendant.  A Guidelines sentence
properly takes into account the circumstances of the offense, the
defendant's background, and, the Government submits, is
appropriate in this case.

        Finally, the letters from the defendant's family and
friends, as well as the defendant's submission, suggest that a
Guidelines sentence would be an unfair punishment to the
defendant's family.  This suggestion is misplaced.  The defendant
faces the same sentence that every convicted 40-kilogram heroin
dealer faces.  This punishment is not unfair – it is appropriate.
The fact that the defendant has family and friends that will miss
him while he is incarcerated is consistent with most convicted
defendants – a consequence of the *defendant's* actions.
Obviously, the defendant has no obligation to accept
responsibility for his actions.  The defendant does not have to
apologize for what he did.  It is his right to contest his
conviction.  But the defendant wants the benefits that often
attach to a defendant who does accept responsibility for his
actions in the form of leniency from the Court.  This is
undeserved, and the Court should reject his efforts and impose a
sentence within the Guidelines.

        For these reasons, the Government contends that a
Guidelines sentence is appropriate and reasonable in this case.

Hon. Lewis A. Kaplan
May 19, 2008
Page 12

## Conclusion

   For the foregoing reasons, the Government respectfully submits that the defendant should be sentenced within the Guidelines range of 235 to 288 months' imprisonment.


         Respectfully submitted,

         MICHAEL J. GARCIA
         United States Attorney


By: _____
         Todd Blanche/John Hillebrecht
         Assistant United States Attorney
         Tel.: (212) 637-2494
         Fax.: (212) 637-2390

cc: William H. Devaney, Esq.
   Liam C. Ewing, Jr., Esq.
   Venable LLP
   Rockefeller Center
   1270 Avenue of the Americas, 25th Floor
   New York, New York 10020
   (via e-mail and ECF)